UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| SCOTT MARTIN, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| LG ELECTRONICS USA, INC., LG ELECTRONICS, INC., HITACHI-LG DATA STORAGE, INC., CYBERLINK.COM CORP., CYBERLINK CORP., and JOHN DOES 1 through 20, | ) ) ) ) ) ) ) | Case No. 14-cv-83 |
| Defendants. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Scott Martin ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated, and alleges upon personal knowledge as to his own acts, and upon information and belief following investigation of counsel, against Defendants LG Electronics U.S.A., Inc., LG Electronics, Inc., Hitachi-LG Data Storage, Inc., Cyberlink.com Corp. d/b/a CyberLink USA, Cyberlink Corp., and Doe Defendants 1-20, stating as follows:

### INTRODUCTION

1.      Plaintiff seeks relief for himself and similarly situated purchasers of Defendants' popular LG Blu-Ray Disc players ("BD players"), which were bundled with obsolete and discontinued software preventing the BD players from playing Blu-Ray Disc titles ("BDs") released after their purchase.

2.      By bundling obsolete software with their BD Players, Defendants forced consumers to buy software upgrades, or to pay money or search for alternative software, and to incur installation hassle, computer damages, and other losses, in order to make reasonable use of their purchase.

3.      The obsolete software impaired the functionality of the BD players, making the players less functional and valuable than what consumers paid for, in violation of applicable law.

## PARTIES

4.      Plaintiff Scott Martin is a citizen of Wisconsin and resides at 205 Acewood Blvd., Madison, Wisconsin 53714.

5.      Defendant LG Electronics, U.S.A., Inc. ("LGUS"), is a corporation organized under the laws of the State of New Jersey and has its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

6.      LGUS is a wholly owned subsidiary of LG that operates at LG's direction in importing, marketing, offering for sale and selling products under the brand name "LG."  LGUS holds itself out as "LG" to the public as if it is a single integrated entity with its parent, LG.  LGUS purports to be one of the world's leading manufacturers of consumer electronics.  LGUS has brought U.S. court litigation affecting "LG"-branded products.

7.      Defendant LG Electronics, Inc. ("LG") is a South Korean corporation with its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeungpogu, Seoul, South Korea. LG controls an integrated enterprise comprised of itself and other entities including LGUS and HLDS, and thus references to LG include LGUS and HLDS or *vice versa*.

8.      Defendant Hitachi-LG Data Storage, Inc. ("HLDS") is a joint venture between LG and Hitachi, Ltd. ("Hitachi") with its principal place of business at 4F, MSC Center Building, 22-23,

Kaigan 3-Chome, Minato-Ku, Tokyo, Japan, 108-0022.  Hitachi and LG have at relevant times jointly owned, controlled, and/or directed the operations of HLDS.

9.     Defendant CyberLink Corp. is a Taiwanese company with its principal place of business at 15F, No. 100, Minquan Rd., Xindian Dist., New Taipei City 231, Taiwan.

10.    Defendant CyberLink.com Corp., d/b/a CyberLink USA, is a corporation organized under the laws of the state of California with its principal place of business at 2700 Augustine Dr., Suite 210, Santa Clara, California 95054, which is also the principal U.S. location of its parent company, CyberLink Corp.  CyberLink.com Corp. markets and sells BD player software and serves BD player customers in the United States.  Collectively, these entities are referenced as "CyberLink."

11.    Doe Defendants 1-20 are officers, employees, and agents of Defendants and other entities who are or may be liable for the wrongful conduct alleged herein, and/or who may have participated as co-conspirators with Defendants, whom Plaintiff may name as additional Defendants upon learning their true identities following discovery.

12.    Each and every Defendant acted as an aider, abettor and co-conspirator of each and every other Defendant, or is obligated by law to be financially responsible for such conduct.  In engaging in the conduct alleged herein, each Defendant acted as the agent, employee, representative, partner or joint venture of the other Defendants in the commission of the acts alleged herein, and acted within the course and scope of its duty as such agent, employee, representative, partner or joint venturer.  The acts of each Defendant were authorized or ratified by each other Defendant, and together constitute a single and continuing course of conduct.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. §§ 1332(d)(2).  Plaintiff Martin is a citizen of the State of Wisconsin; at least one of the Defendants is a foreign corporation with other citizenship (LG has its principal place of business in South Korea, LGUS has its principal place of business in the State of New Jersey, HLDS has its principal place of business in Japan, CyberLink Corp. has its principal place of business in Taiwan, and CyberLink.com Corp. has its principal place of business in the State of California); based on the total value of the claims and relief sought by Plaintiff individually and on behalf of the class, the total amount in controversy exceeds five million dollars; and each Class alleged reasonably exceeds 100 persons.

14.     This Court has personal jurisdiction over Defendants under applicable long-arm statutes. Defendants are each "persons" within the context of those statutes and directly and through their agents conduct substantial, continuous, and systematic activities in the Western District of Wisconsin, as well as throughout the United States.  Defendants intentionally and purposefully placed their products into the stream of commerce in the Western District of Wisconsin, as well as throughout the United States.

15.     Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391 because, *inter alia,* Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to reside in this district.

## FACTS

### The BD Player

16.     BDs are a type of optical storage medium used to store and play movies and other digitally recorded material.

4

17.    BDs store information more densely than other optical discs such as Digital Video Discs ("DVDs") or Compact Discs ("CDs"), offering more than five times the information storage capacity of DVDs.

18.    The more densely stored information on BDs is accessed by a violet-colored laser, which is generated by the BD Player.

19.    A user who wants to access the information in a BD, such as movies, video games, or other digital content, must have a BD player.

20.    BDs incorporate proprietary technology to protect their contents from reproduction.

21.    A BD player looks like a CD or DVD player, but in reality it can only play the content on a particular BD if it is equipped with software unlocking the proprietary technology encoded on that BD and enabling access.

22.    In order to produce, market, provide and/or sell a BD player or associated software, manufacturers and providers are required to enter into various agreements with BD industry entities that own, protect, copyright, license and regulate this proprietary technology.[1]

23.    One such industry consortium is the Blu-ray Disc Association ("BDA"), which develops and licenses BD technology and institutes BD format standards, including establishing a content management system to protect against illegal copying.  Upon information and belief, LG and Hitachi are or have been at relevant times Board of Director members, and CyberLink is or has been a contributing member of the BDA.

24.    Other industry groups, including the Advanced Access Content System Licensing Administrator, LLC ("AACS"), for or in conjunction with the BDA, set standards for preventing

---

[1] Further discovery will clarify Defendants' obligations under any such agreements, as well as relevant industry standards established by stakeholders and/or Doe Defendants in the Blu-ray Disc Association and other similar entities.

unauthorized content distribution and digital rights management, and protect and profit from copyright and technology and data encryption methods developed by BDA licensors.

25.     Upon information and belief, Defendants have entered into agreements with these trade groups, including the Format and Logo License Agreement ("FLLA") promulgated by the BDA, which specifies which content protection system the licensee is required to use, and the AACS Final Adopter Agreement ("FAA"), which sets forth terms for periodic updating of software to match evolving content protection coding.

26.     The copyright protection measures implemented by these groups can revoke a BD player's access to BD media by "expiring" the player's "device key set" – the digital equivalent of changing the locks.  A BD player with an expired key set cannot access media on new BDs, which are encoded with technology recognizing the expiration and preventing play.   The equivalent of locks and keys thus accompany the BD players at issue in this case and require periodic updates in order for BD players to unlock and play BD content.

27.     Because the necessary device key set is updated periodically, BD player software must similarly be updated periodically to allow playback of discs containing more up-to-date key sets. As the proprietary coding on BDs changes over time, the software enabling a BD player to access protected content must be updated, or the BD player will be unable to read the BD.

28.     BD players for sale come "bundled" with this kind of software, without which the players are not functional.

29.     Some BD titles and/or players require that the BD player maintain an online connection to remote servers to enable access to software updating and/or AACS services, including downloaded or streamed content.

30.     Defendants LG, LGUS, and HLDS have made, designed, provided, packaged, marketed, and/or sold BD players, including "Super Multi Blue" model players, in the United States beginning as far back as around February 2007.

31.     The "Super Multi Blue" BD player has remained on the market for sale as a new product for years thereafter.

32.     The product packaging and its contents indicate that HLDS and CyberLink designed or provided the software; that HLDS and LG are makers of and responsible for the product; that CyberLink, HLDS, and LG are responsible for the PowerDVD software; and that LGUS and/or LG import, market, sell and/or distribute such products for sale and consumption in the United States.

33.     The "Super Multi Blue" BD player packaging (including as purchased by Plaintiff) represents that the device is an "internal BD-Rom/DVD Rewriter" and states that it is "compatible with all BD/DVD/CD Formats" with a "10x BD Reading Speed."

34.     The BD player packaging (including as purchased by Plaintiff) promises that the player is sold with software called "PowerDVD." The owner's manual included with the BD player purchased by Plaintiff, dated 2009, states that the package includes an "application software disc." The manual further provides that users may "[c]heck for software updates to all of your writing software."

35.     The BD player owner's manual also advises purchasers that they can "install the automatic firmware download program, 'LG ODD Online F/W update.' This program will automatically check for new firmware releases and download them. It is also included on the software discs that accompany our drives."

36.     The owner's manual also explains that "[y]our system, upon Power On and bootup after installing and connecting the new BD-ROM/DVD Rewriter, will recognize and load native software drivers automatically."

37.     The owner's manual, warranty, and BD player packaging did not disclose any software compatibility issues or the fact that a paid software upgrade would be required to play all BD formats.  Nor did the manual provide any clue as to where, how, or if consumers could learn that the bundled software would require a paid upgrade.

38.     The owners' manuals included with other BD players made by LG, LGUS, and/or HLDS and purchased by other Class members included like statements.

## The Software

39.     PowerDVD, developed by CyberLink, is one type of software that enables access to protected content on BDs and comes bundled with BD players designed, made, marketed, and sold by LG, LGUS, and/or HLDS, including the "Super Multi Blue" BD player.  CyberLink's software supports a substantial share of the BD player market.

40.     PowerDVD's primary function on BD players is to allow playback of BDs.

41.     CyberLink's self-described business philosophy is mutual collaboration, whereby the company works to develop long-lasting relationships with distributors of its software, including HLDS, LG, and/or LGUS.

42.     Bundling PowerDVD with PC systems and optical drives is a recognized CyberLink business strategy and has enabled the company to sell and distribute millions of copies of PowerDVD.

43.    During the relevant time period, CyberLink had an ongoing business relationship with HLDS, LG, and/or LGUS that involved providing PowerDVD software for bundling with HLDS, LG, and/or LGUS BD players, including the "Super Multi Blue" BD player.

44.    On or about November 16, 2009, CyberLink stated that it was "delighted to partner with HLDS" to provide bundled "PowerDVD" software for BD players, and that the company partnered with multi-national corporations and "had operations in North America."

45.    Software like PowerDVD must be continually updated so that it can read BDs incorporating updated proprietary technology.

46.    Vendors like CyberLink, in partnership with BD player manufacturers, therefore typically provide the service of continuing software updates to purchasers of BD players.

47.    Under the AACS Final Adopter Agreement entered into by CyberLink, LG, LGUS, and/or HLDS, these "periodic updates" of software must be provided "via means not unduly burdensome to the end user."

48.    The AACS Final Adopter Agreement further requires that "[a]t any time that Adopter . . . replaces a Device Key of a unit of a Licensed Product via a Periodic Update, Adopter shall issue one or more Periodic Updates to such unit as necessary so as to cause the resulting Licensed Product to include the changes that would have resulted if the unit had received all sequential Periodic Updates designed for . . . such unit since the time the unit was first distributed."

49.    PowerDVD 8, the version of CyberLink's software bundled with the "Super Multi Blue" player that Plaintiff purchased (and bearing the LG and Hitachi-LG Data Storage, Inc. logos and containing the name "Hitachi Data Storage, Inc."), was first available on or about April 1, 2008.

50.    PowerDVD 9, a subsequent version of the software, was first available on or about March 2, 2009.   An iteration (e.g., "PowerDVD 9.x") of PowerDVD 9 was the current version of

PowerDVD software at the time LG, LGUS, and/or HLDS released and marketed the "Super Multi Blue" model that Plaintiff purchased.

51.     PowerDVD 10, the next version of CyberLink's software, was first available in or about March 2010; iterations of PowerDVD 10 were the current version of the software during much of the time when Plaintiff's "Super Multi Blue" model was sold as a new product.

52.     PowerDVD 11, an even more recent version of the software, was first available in or about April 2011, but Defendants did not offer Plaintiff an opportunity to update to this version.

53.     CyberLink issued the last "patch" updating PowerDVD 8 in April 2010 and then stopped supporting that version of the software, making some BD titles released after that date incompatible with PowerDVD 8 and preventing playback of these titles.  The fact that CyberLink had abandoned its software-updating service was not disclosed to Plaintiff or other purchasers of BD players that came with PowerDVD 8.

54.     PowerDVD 8 was thus already obsolete at the time that Plaintiff purchased the "Super Multi Blue" model UH10LS20 BD player in February 2011.

55.     CyberLink continued to stop supporting and/or "patching" subsequent versions of PowerDVD software developed and used in Defendants' products, before sale.

56.     Compatibility updates or "patches" for the PowerDVD 9 were discontinued in May 2011, so that BD titles released after June 2011 would be incompatible with PowerDVD 9.  However, Defendants' "Super Multi Blue" players containing "Super Multi Blue Install Discs" with PowerDVD 9 (and like representations as prior versions of PowerDVD) were available for sale by major retailer at least as recently as mid-2013.

57.     Despite its representations and obligations under the AACS Final Adopter Agreement and/or other agreements, CyberLink failed to provide software or support for updated AACS and/or other device keys in an unduly burdensome fashion or for no additional fees.

58.     Instead, CyberLink provided Plaintiff and other Class members with the opportunity to continue needed software support only by paying a hefty sum to *upgrade* their BD player software.

59.     LG, including LGUS and HLDS, were aware of this practice yet continued to design, produce, market and/or sell the BD players bundled with discontinued software, with no option for an update.

60.     At relevant times Defendants knew, or were reckless in not knowing, the outdated specifications and version(s) of the PowerDVD software provided to Plaintiff and the Class with their BD player purchases.

61.     Nonetheless, Defendants did not give Plaintiff or the Class notice that the PowerDVD software was or could be out of date and would require a paid upgrade to read all BDs.

**Defendants' Planned Obsolescence Scheme**

62.     As members of the BDA and/or related trade groups, Defendants (or, in the case of LGUS, its controlling principal) exert control over or participate in establishing and maintaining the standards for protecting BD technology and copyright, including when and how proprietary locks and keys on BDs and BD players change over time.

63.     As makers of BD players and providers of software, Defendants were required to enter into agreements with the various BD trade groups in order to produce, market, and sell their products, including but not limited to the FLLA promulgated by the BDA and the AACS's FFA.

64.     Upon information and belief, these trade association agreements set forth terms for copyright protection and require periodic updating of software to match evolving content protection technology.

65.     Defendants thus know of and/or participate in establishing and maintaining a system in which BD players' device key sets periodically expire, requiring new software to play any BD programmed to recognize that expiration.

66.     In fact, the FLLA and FAA expressly anticipate that BD players will require continual software updates to play BDs.

67.     Defendants LG, LGUS, and/or HLDS nonetheless bundled their BD players with PowerDVD software that was outdated, which CyberLink was no longer supporting or "patching" so that it could be updated to read recently released or to be released BDs.

68.     Defendant CyberLink knowingly supplied LG, LGUS, and/or HLDS with obsolete software that was several versions behind the current edition of PowerDVD and could not be updated to read recently released or to be released BDs.

69.     Defendants LG, LGUS, and/or HLDS knew, or were reckless in not knowing, that an obsolete CyberLink software program no longer supported by CyberLink would require a paid upgrade to the most recent version rather than merely a free update.

70.     Defendants also knew that BD players containing obsolete CyberLink software, purchased by Plaintiff and the Class, would be sold at retail for a period of time much longer than pre-existing BD key sets, which would in effect prevent consumers from watching BD titles without prior notice (absent paying for an upgrade, or trying to figure out why the title cannot play and then figuring out a software solution).

71.     The number of BD players, including "Super Multi Blue" players, made, produced, or sold by the Defendants ensured that the BD players would be sold at retail long after the supporting software was discontinued.

72.     At relevant times during the applicable class periods – including long before Plaintiff purchased his BD player at retail – consumers have complained to LG and CyberLink that their BD players are unable to play BDs using an outdated version of the PowerDVD software.  Such complaints have effectively fallen on deaf ears, and Defendants have continued marketing and selling BD players with discontinued software to Plaintiff and the Class.

73.     Planned obsolescence is thus built into Defendants' business model: the BD player Plaintiff purchased, made by LG, LGUS, and/or HLDS and bundled with CyberLink's obsolete software, was incapable of playing all BD formats from the start, forcing the consumer to buy an upgrade or alternative software.

74.     Upon information and belief, competitors who make and market BD players, including associated firmware and software, provide continuing software support and free automatic software updates at no charge.

75.     As part of their planned obsolescence scheme, LG, LGUS, and/or HLDS made BD players and promoted and sold them in the United States.

76.     HLDS, in partnership with CyberLink, developed, produced, and held the copyright on the outdated software bundled with LG, LGUS, and/or HLDS's BD players.

77.      Under the terms of this partnership, CyberLink not only gained access to a large market for its bundled software, but also generated a customer base it could later charge for upgraded software and associated services.

78.     As members of proprietary BD trade groups, Defendants were aware at relevant times that their lock-and-key system would expire the ability of BD players to play some BDs, yet failed to alert Plaintiff and the Class to this incompatibility before purchase of BD players, at the time of software installation, or before renting, purchasing, or playing back BDs.

79.     Upon information and belief, Defendants have co-extensive business interests as described above, including CyberLink's agreements and project partnerships with HLDS., LG, and/or LGUS to furnish PowerDVD software for BD players purchased by Plaintiff and the Class.

80.     Upon information and belief, Defendants bundled BD players with obsolete software in furtherance of their scheme whereby LG, LGUS, and/or HLDS would obtain outdated software from CyberLink at a discount and in volume enabling production cost savings, so that CyberLink could in turn charge consumers to upgrade the outdated software.

81.     Under the terms of their agreements and partnerships, Defendants continued marketing and selling BD players bundled with discontinued PowerDVD software despite their knowledge that numerous consumers had complained the software was obsolete and despite their awareness that BD content protection technology would expire.

82.     Defendants' practice has been to peddle a large volume of BD players with discontinued software during the class period and then to address resulting consumer complaints via misdirection or by steering consumers to pay for an upgrade.

83.     In fielding consumer queries, LG recommends that consumers look elsewhere.  LG has stated that its BD player has nothing to do with disc incompatibility: "When you cannot play a movie or burn a DVD, normally you will need to update your PC software.  Nothing related with LG."  LG has further stated, "We regret the trouble you have experienced with your third-party

software" and that "the only software we can recommend is that which is provided with the drive."   *See*  http://answers.lg.com/answers/7676/product/1000011127/lg-electronics-ch10ls20-questions-answers/questions.htm.

84.     In addressing another consumer inquiry ("bought a desktop with the drive, but blu-ray won't read"), LG responded: "Nothing related with LG.  Most Common software upgrade you would need is Power-DVD." *See id.*

85.     Responding to yet another consumer, LG stated, "Thank you for your question. The PowerDVD software should work with your BD movies. If it does not please check with PowerDVD for their newest software.  This is not an LG problem." *See id.*

86.     CyberLink's response to consumer complaints at relevant times has been to advise consumers to purchase the PowerDVD upgrade.

**Plaintiff's Experience**

87.     On or about February 13, 2011, Plaintiff purchased his BD player, "Super Multi Blue" model UH10LS20, for $79.99 from a popular vendor, Newegg, Inc. ("Newegg"), via Newegg.com.

88.     The BD player that Plaintiff purchased was made, designed, provided, packaged, marketed, distributed and/or sold by and through HLDS, LG, and/or LGUS.

89.     Defendants LG, LGUS, and/or HLDS caused the representations on the packaging to be made to Plaintiff, at the time of retail purchase and delivery within the return period.   In combination with CyberLink, said Defendants also caused the software-related representations that came with Plaintiff's BD player to be made to him.

90.     The BD player that Plaintiff purchased included PowerDVD 8 software, which was provided on an optical disc labeled "Super Multi Blue Install Disc" bearing the words

"Copyright © 2009 Hitachi-LG Data Storage, Inc." and, like the product packaging, the LG and HLDS logos.

91.     PowerDVD 8 was the only version bundled with the BD player Plaintiff purchased, even though both PowerDVD 9 and 10 were available and CyberLink had stopped supporting or providing compatibility updates to PowerDVD 8 nearly one year before Plaintiff's purchase.

92.     Defendants did not provide Plaintiff with notice either at the time of purchase or when he installed the PowerDVD software that the version sold with his BD player was obsolete; nor did the BD player packaging, warranty, owner's manual, or software installation instructions alert him that he might not be able to update the software or that a paid software upgrade would be required for him to make full use of his purchase.

93.     In October 2011 (and within the product warranty period), Plaintiff tried to use his BD player to watch a popular, widely distributed Blu-ray movie ("the rented movie"), which he had rented (and contracted to rent) from one of the nation's largest Blu-ray movie vendors, Netflix.

94.     Due to Defendants' conduct, Plaintiff's BD player could not play the rented movie. Instead, when Plaintiff tried to use the BD player, and with no prior notice, Plaintiff's viewing screen presented a message indicating that he had to buy a PowerDVD software "upgrade" in order to watch the movie.

95.     Specifically, Plaintiff's computer screen presented an online webpage entitled "Welcome to the Update Center for Blu-ray Disc and HD DVD."

96.     That webpage contained links to other Internet webpages for free "updates" and paid "upgrades" to the "latest version" of PowerDVD.

97.    The click-throughs, however, confirmed that free "updates" were unavailable, and required Plaintiff to purchase an "upgrade" to PowerDVD 11, the most recent version of the software, if he wanted to watch the rented movie using his BD player and PowerDVD software.

98.    The cost of the upgrade to PowerDVD 11 was roughly the same as the price Plaintiff had paid for his BD player.

99.    Plaintiff was unable to play the rented movie.

100.    Plaintiff was subsequently directed to the same paid-upgrade requirement when he attempted to play other BD movies.

101.    Although PowerDVD 8 was already obsolete at the time that the "Super Multi Blue" model UH10LS20 BD player was released, none of the Defendants notified Plaintiff as to whether a free upgrade option was available or how to secure such an upgrade if it were available, and the update center website Plaintiff was directed to did not offer a free upgrade.

102.    Because Plaintiff's BD player was equipped with obsolete software, he was unable to enjoy the fruits of his BD player purchase, and could not watch one or more BD titles that he paid to rent.

103.    Plaintiff sent notice and demand letters to LG, LGUS, CyberLink, HLDS, and Hitachi (one of HLDS's corporate parents), complaining that his BD player and bundled software could not play some BDs and requesting that he and other purchasers of BD players be compensated for their damages.

104.    Hitachi responded stating that it could not answer inquiries regarding BD players marketed under brand names other than its own.  HLDS similarly advised Plaintiff to contact LG with his complaint.

105.    LG and LGUS did not respond to Plaintiff's letters.

106.    CyberLink responded and informed Plaintiff that the reason his BD player would not play some BDs was "because of the Advanced Access Content System (AACS), a standard protecting movies from illegal copy (restricting copy and access) and adopted by the Blu-ray Disc Association (BDA).  Without the correct updated keys it will not be possible to view some new movies, according to the AACS compliance rule."

107.    CyberLink further explained that "[w]hen AACS keys get revoked or get updated, done by releasing new Blu-ray disc titles in which new AACS keys update are enforced, we inform end users through software interface to update their software to renew the keys."

108.    CyberLink stated that "periodic [PowerDVD] software updates to ensure new Blu-ray playback capabilities . . . should cover new AACS keys" and that "[s]uch update process requires no additional fees."  CyberLink appears to claim that all AACS key updates will be covered by free update services and a paid upgrade would be required only if the consumer "wish[es] to have more features" available.  However, this statement is inconsistent with the fact that CyberLink stopped issuing any free updates at all for PowerDVD 8 long before Plaintiff even purchased his BD player.

109.    Other consumers in Wisconsin and the United States experienced like problems with Super Multi Blue players and other BD players made, designed, provided, packaged, marketed, distributed and/or sold by HLDS, LG, and/or LGUS and which included the same promises and omissions.

## Harm Resulting from Defendants' Conduct

110.    During the Class Periods, LG, LGUS, and/or HLDS were responsible for, and exerted control over, the manufacture, assembly, packaging, and/or marketing of the BD players and their included software.

18

111.    At relevant times, CyberLink, HLDS, LG, and/or LGUS jointly and severally caused outdated PowerDVD software to be bundled with BD players of the type purchased by Plaintiff and to be marketed, distributed, and sold to consumers in Wisconsin and throughout the United States.

112.    CyberLink, LG, LGUS and/or HLDS knew, or were reckless in not knowing, that the PowerDVD software bundled with the BD players was, and/or would be, discontinued at the time of sale to Plaintiff and the Class – forcing them instead to pay for an upgrade or alternative software support in order to have properly functioning BD players and play back BDs.

113.    Defendants caused Plaintiff and other Class members damages because their BD players were worth less than the purchase price; as purchased, they could not derive the full benefit of their BD players; Defendants furnished them with BD players and bundled software that purportedly could play all BD formats but which in fact could not, and therefore were worth less than Defendants represented; and Defendants' acts frustrated their ability to enjoy their BD players.

114.    Defendants caused Plaintiff and other Class members damages by preventing them from playing or enjoying BD titles, including BD titles that they paid to rent or buy; and by costing them time, energy, and hassle of trying to figure out, and resolve, why their BD titles would not at relevant times play.

115.    Defendants caused Plaintiff and other Class members damages to their computers by inducing them to install obsolete software, which embedded itself on a multiplicity of locations on their computers and hard drives.  One frustrated consumer noted in October 2010:

> De-installing any of CyberLink's software will leave with hundreds if not thousands of Registry entries which are nigh impossible to delete, as well as applications still running surreptitiously in the background which are difficult to stop and remove. It can be done, but it may take you many hours and you may be

left with a hobbled Registry if you're not just real good at what you're doing and very careful to boot.

*See* http://www.amazon.com/Cyberlink-DVD-EA00-PRS0-00-PowerDVD-10-Standard/product-reviews/B003CP04II.

116.    Had Plaintiff and other Class members known of the facts alleged herein, including the obsolete nature of the needed software, or had they received like disclosures or straightforward representations on or inside the product that came with the purchase, they would not have purchased their BD player or would have returned it or paid far less for it.

## CLASS ALLEGATIONS

117.    Plaintiff brings his claims under Fed. R. Civ. P. 23 both individually and as representative of the following Classes of similarly situated individuals.

> Wisconsin Class.  All persons in Wisconsin who purchased LG, LGUS, and/or HLDS Blu-ray Disc players bundled with discontinued CyberLink software at any time between February 8, 2008 and the date of an order granting class certification.

> Wisconsin Super Multi Blue Subclass.  All persons in Wisconsin who purchased LG, LGUS, and/or HLDS Super Multi Blue Blu-ray Disc players bundled with discontinued CyberLink software at any time between February 8, 2008 and the date of an order granting class certification.

> National Class.  All persons in the United States who purchased LG, LGUS, and/or HLDS Blu-ray Disc players bundled with discontinued CyberLink software at any time between February 8, 2008 and the date of an order granting class certification.

> National Super Multi Blue Class.  All persons in the United States who purchased LG, LGUS, and/or HLDS Super Multi Blue Blu-ray Disc players bundled with discontinued CyberLink software at any time between February 8, 2008 and the date of an order granting class certification.

Excluded from each Class are Defendants, their current and former officers and directors, Plaintiff's counsel, Defendants' counsel, and any member of the judiciary presiding over this action.  Plaintiff intends to modify the class definition(s) or class relief as appropriate, following

discovery and upon briefing class certification.  References to the "Class" are to members of each Class and Subclass.

118.    All Class members purchased BD players with CyberLink software that was necessary for their BD players to function properly but was already discontinued at the time of sale.

119.    Under Fed. R. Civ. P. 23(a)(1), the members of each Class are so numerous that individual joinder of their claims is impracticable.

120.    Under Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law or fact common to Plaintiff and the other Class members, and those common questions predominate over any questions affecting only individual members.  For example:

a.      Did Defendants assemble, distribute, market, promote, and/or sell outdated or discontinued PowerDVD software with the BD players purchased by Plaintiff and the Class?

b.      Did Defendants' conduct unlawfully interfere with contracts between purchasers and vendors of BD players?

c.      Did Defendants' conduct fraudulently induce Plaintiff and Class members to purchase BD players bundled with outdated or discontinued software?

d.      Did Defendants' conduct as described herein violate the common law of fraud?

e.      Did Defendants' conduct violate the Wisconsin Deceptive Trade Practice Act?

f.      Were Defendants unjustly enriched by making, distributing, marketing, and selling BD players and included software worth less than Defendants represented?

g.      Did Defendants conspire to (i) bundle, market, distribute, or sell outdated or discontinued software with the BD players; (ii) fraudulently induce Plaintiff and Class members to purchase the BD players; (iii) make unlawful misrepresentations and/or

omissions to Plaintiff and the Class; or (iv) tortiously interfere with their contracts, as more fully set forth herein?

121.    Under Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of other Class members who purchased Defendants' BD players bundled with obsolete software at relevant times.

122.    Plaintiff has no adverse or antagonistic interests to those of the Class and has retained counsel experienced in complex class action litigation.

123.    A class action is an appropriate and superior method for fairly and efficiently adjudicating this controversy.  The damage suffered by individual Class members is relatively small compared to the burden and expense entailed by individual litigation of the claims against Defendants.  Even if select Class members could afford individualized litigation, the court system could not.  Individualized litigation would only increase the delay and expense to all parties and the court system.  In contrast, the class action device provides the benefit of a single adjudication of the issues at bar, and presents no unusual management difficulties under the circumstances here.

## CAUSES OF ACTION

124.    Plaintiff alleges the following and herein-described claims, supporting statements, and asserted relief in the alternative as applicable pursuant to Fed. R. Civ. P. 8(a)(3), (d)(2).

## COUNT I
### Tortious Interference with Contract
### (Against All Defendants Jointly and/or Individually in the Alternative)

125.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein, and brings this cause of action individually and on behalf of each Class and Subclass.

126.     Newegg offered to sell Plaintiff a BD player made by LG, LGUS, and/or HLDS. Plaintiff accepted Newegg's offer, and paid money in exchange for the BD player.  Plaintiff thus had a contractual relationship with Newegg.

127.     As part of the contract, Newegg agreed to sell Plaintiff a functional BD player that would play BDs.  The contract additionally provided that the BD player would be compatible with all BD formats and that it came with PowerDVD software.

128.     Defendants knew of Plaintiff's contract with Newegg, as well as similar contracts between other class members and other vendors of their products.

129.     Defendants were not party to Plaintiff's contract with Newegg.

130.     When Plaintiff attempted to play certain BDs, he was blocked from doing so by a pop-up screen generated by CyberLink and informing him he had to purchase a PowerDVD upgrade from CyberLink in order to use his BD player.

131.     The pop-up screen and requirement that Plaintiff buy a software upgrade interfered with not only Plaintiff's ability to use his BD player but also Newegg's contractual promise to provide a functional BD player that was compatible with all BD formats.

132.     By providing discontinued software that prevented Plaintiff's BD player from functioning as Newegg promised, as more fully set forth above, Defendants caused Newegg not to perform the contract and diminished the value of Plaintiff's bargain.

133.     Defendants knew that the PowerDVD software was continually updated and upgraded to stay ahead of evolving piracy threats, and that without current software-updating services Plaintiff's BD player would not be able to access protected media on BDs.  Nonetheless, they intentionally bundled the discontinued software with Plaintiff's BD player.

134.    As members of the BDA and/or other industry associations, Defendants LG, LGUS, HLDS and/or CyberLink knew about and participated in establishing or maintaining new proprietary BD technology that existing BD players could not read without a software upgrade.

135.    As members of the BDA and/or other industry associations, Defendants LG, LGUS, HLDS, and/or CyberLink intentionally and improperly interfered with Plaintiff's contract by establishing or maintaining, after the sale of Plaintiff's BD player, new BD copyright-protection coding that could only be unlocked by buying something new – including CyberLink's upgrade – or by replacing the software that came with the BD player.

136.    Defendants also entered into partnerships and agreements with each other, as set forth above, which enabled the "hold-up" or prohibition on playing BDs in an effort to coerce a paid software upgrade, after retailer sale.

137.    Defendants' intentional, improper, and malicious interference with the contract between Plaintiff and Newegg was extraneous to that contract.

138.    Defendants were not justified or privileged to interfere with the contract between Plaintiff and Newegg.

139.    As a result of Defendants' intentional, improper, and malicious interference with Plaintiff's contract with Newegg, and similar contracts between other consumers and vendors of BD players, Plaintiff and the Class have suffered and/or will suffer damages.

140.    Defendants' intentional, improper, and malicious interference with these contracts caused Plaintiff and other Class members damages and pecuniary loss: not only did they spend money on a product and associated services that did not work as promised, but they also paid to rent or purchase BDs which they could not watch, invested additional funds, time, and/or effort to

obtain either the PowerDVD upgrade or alternative software, and suffered damage to their computers.

141.    As a result of Defendants' intentional, improper, and malicious interference, Plaintiff and the Class are entitled to all damages and relief recoverable.

**COUNT II**
**Common Law Fraudulent Misrepresentation**
**(Against Defendants LG, LGUS, and/or HLDS)**

142.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein, and brings this cause of action individually and on behalf of each Class and Subclass.

143.    Defendants LG, LGUS, and/or HLDS were responsible for assembling, packaging, distributing, marketing, and selling the BD players they made.

144.    Defendants LG, LGUS, and/or HLDS were in exclusive control of bundling CyberLink's PowerDVD software with the BD player Plaintiff and other Class members purchased, including selecting the version of PowerDVD sold.

145.    Defendants LG, including LGUS and HLDS, participated in setting the standards for BD licensing/copyright-protection technology, including how those standards changed over time and what software or permissions would be required to unlock new proprietary coding, which were not disclosed to Plaintiff and the Class.

146.    Defendants LG, LGUS, and/or HLDS represented through their packaging and marketing that the BD players were bundled with PowerDVD software that would enable the players to read BD media.

147.    Specifically, the BD player packaging visible to Plaintiff and other consumers, at the time of purchase, and/or upon delivery within periods permitting return of the player to the vendor,

promised that the BD players would play BDs regardless of format: the BD player box stated that the player was "compatible with all BD/DVD/CD formats."

148.    These representations were false: the BD player could not play "all BDs" because it lacked the software necessary to read a universe of BDs, and the included software was limited in reading BD media due to the above-described facts.

149.    Defendants LG, LGUS, and/or HLDS also represented to Plaintiff and other consumers through the owner's manual included in the BD player box that software and firmware "updates" would be available and could be downloaded "automatically."

150.    This representation was similarly false: in fact, all PowerDVD 8 updating services had been discontinued and software updates could not be automatically downloaded.

151.    Defendants LG, LGUS, and/or HLDS's packaging and marketing failed to disclose to Plaintiff and the Class – at the time of sale, at any reasonable time thereafter, on or within the product packaging, at the time of software installation, or before Plaintiff and other Class members bought or rented BDs that would not play – that the PowerDVD software bundled with the BD player was out-of-date and/or that a current version of PowerDVD would be required to play all BD formats or those BDs that Plaintiff and other Class members attempted to play.

152.    Defendants LG, LGUS, and/or HLDS's packaging and marketing additionally failed to disclose that, in order to restore the BD player's functionality for all BD formats, consumers would be required to purchase a PowerDVD upgrade or find, purchase, and install alternative software.   The BD player box, warranty, and owner's manual omitted any mention of software compatibility issues or a required paid software upgrade for the BD player to be fully functional.

153.    Defendants' scheme provided for the ongoing distribution, marketing and sale of BD players to Plaintiff and other Class members that, Defendants knew, contained obsolete software

and would require a paid upgrade or impose the burden of acquiring alternative software, as set forth more fully above.

154.    Defendants LG, LGUS, and/or HLDS knew that Plaintiff and similarly situated consumers were not, and could not have been, aware that the bundled software was obsolete at the time of purchase, because only Defendants were in a position to know what software they had bundled with the BD players.

155.    Before making their purchases, Plaintiff and the Class could not have discovered through ordinary investigation that the software was obsolete, since no such notice came with their purchases, no notice was provided at the time the software was installed, and the BD player packaging represented that any necessary software was included and updates would be provided.

156.    Moreover, Plaintiff and the Class could not reasonably have been expected to discover that the PowerDVD software was discontinued, since they could not inspect the software before purchase, no post-purchase inspection of the player or software could have revealed any issue, and a reasonable consumer would have expected that the software was functional.

157.    Defendants had a duty to disclose that the bundled software was obsolete and would require a paid upgrade to be functional or to play BDs released after the software was discontinued.

158.    Defendants have at relevant times, including prior to Plaintiff's purchase, received many consumer complaints about the same issues complained of here: coercing consumers to pay for upgrades in order to watch standard-fare BD releases on Defendants' BD players equipped with PowerDVD, which was discontinued before sale, and the inability to play BDs on Defendants' BD players using a discontinued version of PowerDVD.

159.    As set forth more fully above, Defendants LG, LGUS, and/or HLDS knew that CyberLink regularly discontinues its software-updating services and requires paid upgrades for its software, and that without current software, their BD players could not play certain BDs.

160.    Alternatively, Defendants LG, LGUS, and/or HLDS were reckless in not informing themselves as to the adequacy and functionality of the software they bundled, marketed, distributed, and sold with their BD players.

161.    Defendants LG, LGUS, and/or HLDS knew that the specific PowerDVD software bundled with the BD players was discontinued, or alternatively represented that the software was functional with a reckless disregard for whether that representation was true or false.

162.    Defendants LG, LGUS, and/or HLDS knew, or were reckless in not knowing, that their representations and/or omissions regarding the software bundled with their BD players were false.

163.    Defendants LG, LGUS, and/or HLDS made these representations with the intent to defraud consumers like Plaintiff and induce them to purchase, install, and use Defendants' BD players in reliance on the misrepresentations, despite the out-of-date software.

164.    Defendants' omissions and failures to disclose were also made with the intent to defraud consumers like Plaintiff and induce them to purchase, install, and use Defendants' BD players in reliance on the omissions and failures to disclose.

165.    Plaintiff and the Class believed Defendants' material misrepresentations and/or omissions.

166.    In reliance on Defendants' material misrepresentations and/or omissions, Plaintiff and other Class members purchased BD players that did not function as promised, installed the software, purchased or rented BDs, and, to their detriment, were forced to spend money, time,

and/or effort upgrading PowerDVD or obtaining and installing alternative software in order to make use of their purchases.

167.    Defendants' material misrepresentations and/or omissions occurred, in substantial part, when they formulated their packaging, marketing, and sales strategy, long before Plaintiff and other Class members entered into contracts with Newegg or other vendors to purchase BD players.

168.    Upon information and belief, Defendants' scheme by which LG, LGUS, and/or HLDS would obtain outdated software from CyberLink at an attractive price, allowing CyberLink to later charge consumers to upgrade the outdated software, similarly predated Plaintiff's contract with Newegg.

169.    Defendants' material misrepresentations and/or omissions were not interwoven with the contract between Plaintiff and Newegg, but rather were made by third parties and were extraneous to that contract.

170.    Upon information and belief, Defendants' material misrepresentations and omissions were made not for the purpose of altering the quality or character of the BD players but rather to further the scheme between HLDS, LG, LGUS, and/or CyberLink.

171.    Absent Defendants' material representations and omissions, Plaintiff and Class members would not have purchased their BD players, would have returned them, or would have paid much less for them.

172.    Had Plaintiff and other consumers known the software was obsolete, and that they would have to invest additional money, time, and/or effort in upgrading or replacing the PowerDVD software in order to avoid the above-described damages, they would not have bought the BD

player (or at bottom, would have returned it or paid far less for it) and would not have purchased or rented incompatible BDs.

173.    As a result of Defendants' material misrepresentations and/or omissions, Plaintiff and the Class have been damaged and are entitled to all recoverable damages and relief.

**COUNT III**
**Violation of Wis. Stat. § 100.18**
**Wisconsin Deceptive Trade Practices Act**
**(Against LG and/or LGUS)**

174.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein, and brings this cause of action individually and on behalf of the Wisconsin Class and Super Multi Blue Subclass.

175.    The Wisconsin Deceptive Trade Practices Act ("DTPA") is a broad remedial statute designed to protect the public from all untrue, deceptive, or misleading representations made in sales promotions.

176.    LG and LGUS made, packaged, distributed, marketed, and offered for sale to the public Defendants' BD players (with outdated PowerDVD software) purchased by Plaintiff and other Wisconsin consumers, and/or intended that these BD players would be sold, distributed or their consumption increased.

177.    In their packaging and marketing, LG and LGUS caused to be represented to the public that the "Super Multi Blue" BD player was sold with PowerDVD software enabling play of BDs. Specifically, Defendants promoted the bundled software on the BD player package.

178.    This representation, communicated first at the time of purchase and again at receipt and opening of the product packaging, created the reasonable belief that the PowerDVD software, bundled with the BD player that Plaintiff and other Wisconsin consumers purchased, would allow them to play BDs without limitation.

179.   LG and LGUS also represented to the public, via the BD player package, that the player was "compatible with all BD/DVD/CD Formats" and had a "10x BD Reading Speed."

180.   This representation reasonably led Plaintiff and other Wisconsin consumers to believe that the BD player was capable of playing all BDs regardless of format.

181.   In the owner manual provided with the BD player purchased by Plaintiff and the Class, LG and LGUS represented that software and firmware updates would be provided.

182.   These representations reasonably led Plaintiff and other Wisconsin consumers to believe that there would be updates available for any software bundled with the BD player.

183.   LG and LGUS intended these representations to induce Plaintiff and other consumers to purchase (without return) the "Super Multi Blue" BD player, thus incurring an obligation.

184.   LG and LGUS's representations were untrue, deceptive, and/or misleading: contrary to their marketing and packaging claims, the BD player was not in fact able to play "all BD" formatted discs, and the PowerDVD software included was obsolete and incapable of enabling play of popular BDs containing official BD formats.

185.   LG and LGUS's representations materially caused Plaintiff and other Wisconsin consumers pecuniary loss, *inter alia,* because they spent money on a BD player they could not use (they could not play popular BD movies) and spent additional funds buying or renting BDs that their BD players were blocked from playing.

186.   As a result of LG and LGUS's violations of Wis. Stat. § 100.18, Plaintiff is entitled to damages, reasonable costs, attorney's fees, and any other appropriate relief.  *See, e.g.,* Wis. Stat. § 100.18(11)(b).

**COUNT IV**
**Unjust Enrichment**
**(Against LG, LGUS, and HLDS)**

187.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein, and brings this cause of action individually and on behalf of each Class and Subclass.

188.    By paying money to purchase BD players that did not function as promised, Plaintiff and the Class conferred a benefit upon Defendants LG, LGUS, and/or HLDS, who unjustly received and retained economic gain by virtue of each BD player sold.

189.    Defendants LG, LGUS, and/or HLDS appreciated or knew that the BD players they marketed and sold were equipped with obsolete software and would not function as promised.

190.    Defendants LG, LGUS, and/or HLDS appreciated or knew that the purchase price for each BD player equipped with obsolete software exceeded the value received by Plaintiff and the Class.

191.    Defendants LG, LGUS, and/or HLDS appreciated or knew of the economic gain they accrued from sales of their BD players.

192.    Defendants LG, LGUS, and/or HLDS accepted, received, and/or retained economic benefit from Plaintiff and the Class by knowingly selling a substandard product not worth its purchase price.

193.    Under the circumstances, it was inequitable for Defendants LG, LGUS, and/or HLDS to retain profits and the benefit of the bargain, and Plaintiff and the Class are entitled to commensurate relief.

**COUNT V**
**Civil Conspiracy**
**(Against All Defendants)**

194.    Plaintiff realleges each of the preceding paragraphs as if fully set forth herein, and brings this cause of action individually and on behalf of each Class and Subclass.

195.    Defendants LG, LGUS, and/or HLDS together made, marketed, packaged, designed, and sold the BD players at issue in this case.

196.    Defendant CyberLink developed PowerDVD software, including all updates and upgrades, and partnered with LG, LGUS and/or HLDS to bundle the PowerDVD software with the BD players.

197.    Defendant HLDS also partnered with CyberLink to make, develop, package, copyright, design, and distribute the software disc containing CyberLink's obsolete PowerDVD software that was bundled with the BD players.

198.    Defendants LG, LGUS, and HLDS together knowingly agreed to sell and promote BD players by misrepresenting their functionality, including making claims to consumers that the BD player would play "all BD formats" and was bundled with the necessary PowerDVD software to accomplish that purpose, as more fully set forth above.

199.    Defendants LG, LGUS, and HLDS together knowingly failed to disclose that the PowerDVD software was obsolete and that the BD player would not fully function without either a paid PowerDVD upgrade or installation of alternative software, as more fully set forth above.

200.    Defendant CyberLink knowingly conspired with LG, LGUS, and HLDS in their misrepresentations and/or failures to disclose by agreeing to supply LG, LGUS, and HLDS with PowerDVD software it knew to be obsolete.

201.    Defendants LG and LGUS knowingly conspired with CyberLink and HLDS by agreeing to sell the obsolete PowerDVD software along with the BD players they made.

202.    Defendant HLDS knowingly conspired with CyberLink by agreeing to design and market the product and to produce the disc containing the obsolete PowerDVD software, and with LG and LGUS by agreeing to design and market the product and by packaging the disc for sale with their BD players.

203.    Defendants proceeded to commit overt acts in furtherance of the conspiracy by in fact distributing and selling BD players bundled with the obsolete software in accordance with their agreement, and by facilitating installation of the included software.

204.    By agreeing to market their BD players and software based on misrepresentations and/or omissions as to their functionality, Defendants LG, LGUS, HLDS, and CyberLink collectively agreed to inflict a wrong against consumers, who purchased the BD players for more than they were worth.

205.    In doing so, Defendants agreed to violate or disregard the law, including by intentionally interfering with contracts between consumers and vendors, intentionally and fraudulently misrepresenting the functionality of the BD players, violating the Wisconsin Deceptive Trade Practices Act, and unjustly enriching themselves, as alleged more fully above in Counts I-IV of this Complaint.

206.    Defendants' collective conduct, misrepresentations, and/or omissions were unlawful, as alleged more fully above in Counts I-IV of this Complaint.

207.    Plaintiff and the Class justifiably relied upon the unlawful misrepresentations and/or omissions Defendants made as part of the conspiracy.

208.    As a result of Defendants' conspiracy, Plaintiff and the Class spent money to purchase BD players that did not function as promised and importantly, were forced to incur additional damages as set forth more fully above.

209.    Absent Defendants' conspiracy, Plaintiff and other Class members would not have bought their BD players as offered, nor would they incurred other expenses, such as buying or renting BDs that would not play.

210.    As a result of Defendants' conspiracy, Plaintiff and the Class have been damaged and are entitled to recoverable relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.    An order certifying the Classes and Subclasses, and appointing Plaintiff as Class representative and Plaintiff's counsel as class counsel;

b.    A finding and declaration that Defendants, by their above-described conduct, have violated applicable law as set forth above;

c.    An award of all damages to Plaintiff and the Class available under applicable law;

d.    An award of restitution, including interest thereon, to Plaintiff and the Class;

e.    Establishment of a constructive trust for the benefit of Plaintiff and the Class, consisting of an appropriate portion of monies Defendants received from sales of the BD players and software upgrades at issue, until further order of the Court;

f.    Reasonable attorneys' fees and costs; and

g.      Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

Dated:  February 8, 2014                    Respectfully submitted,

SCOTT MARTIN, on behalf of
himself and all others similarly situated

By:   /s/ Frank Jablonski_____
Frank Jablonski, Esq.
State Bar No.: 1000174
Progressive Law Group, LLC
354 West Main Street
Madison, WI 53703
Telephone: (608) 258-8511
Facsimile:  (608) 442-9494

36